Original
No. LD-2003-011

COFFEY'S CASE

Argued: June 15, 2005
Opinion Issued: August 12, 2005

*Law Office of Rodney L. Stark, P.A.*, of Manchester (*Rodney L. Stark* and *Sherry M. Hieber* on the brief, and *Mr. Stark* orally), for the committee on professional conduct.

*Shaines & McEachern, P.A.*, of Portsmouth (*Robert A. Shaines* and *Paul McEachern* on the brief, and *Mr. Shaines* orally), for the respondent.

DUGGAN, J. On December 29, 2003, the Supreme Court Committee on Professional Conduct (committee) filed a petition to suspend the respondent, John J. Coffey, from the practice of law for two years. We referred the petition to a Judicial Referee (*Manias*, J.) for a hearing. The referee found by clear and convincing evidence that the respondent violated New Hampshire Rules of Professional Conduct 1.4(b), 1.5(a), 1.7(b), 1.8(a)(1), 1.8(b), 1.8(j), 2.1 and 8.4(a) and recommended a two-year suspension. We adopt the referee's findings, but we conclude that the respondent's conduct warrants disbarment.

The referee found, and the record supports, the following facts. On July 9, 1998, the respondent's client, Natalie Hopkins, signed a deed conveying to the respondent property located on Ocean Boulevard in Rye. The conveyance was for a stated consideration of $50,000, which was based in part upon the respondent's estimated fee of $30,000 for handling an appeal to this court. The property had been assessed at over $200,000.

The events leading up to this conveyance began in June 1970, when Hopkins and her friends, John and Caroline Canty, purchased the Rye property as joint tenants with the right of survivorship. The property passed to Hopkins after Caroline Canty died in 1986 and John Canty died in 1991.

From 1992 to 1996, the Cantys' son, John Canty, Jr., made various claims in probate court concerning his father's estate. The respondent represented Hopkins in these proceedings and drafted her will, which bequeathed the property to John Canty, Sr.'s grandchildren. The probate court ruled in Hopkins' favor and, on appeal, we summarily affirmed the probate court's decision. *See In re Estate of John F. Canty*, No. 95-874 (N.H. May 3, 1996).

Nonetheless, John Canty, Jr. continued to press his claims and sued Hopkins in 1997, claiming to have a remainder interest in the Rye property. The respondent, on Hopkins' behalf, moved to dismiss the suit on res judicata grounds. The trial court granted the motion and Canty appealed to this court. *See generally Canty v. Hopkins*, 146 N.H. 151 (2001). We accepted the appeal on April 28, 1998.

In May 1998, the respondent discussed the cost of the appeal with Hopkins and told her that the appeal could cost more than $30,000. Hopkins told the respondent that she did not want to dip into her liquid

assets and he proposed to take a mortgage on the Rye property as payment for her legal fees.

On June 2, 1998, the respondent sent Hopkins a letter stating that the appeal would be "very expensive." He noted that they had discussed "an alternative means for payment" and that if she was no longer interested in this alternative means, he would require a retainer of $30,000 and that his fee for the appeal could exceed that retainer. After Hopkins indicated that she was not interested in mortgaging the property, the respondent proposed that he purchase the property.

The respondent recommended three law firms in the Portsmouth area with real estate practices to draft a deed conveying the property to the respondent. Hopkins selected Attorney Bernard Pelech, whom the respondent contacted to prepare a warranty deed conveying the property to him "largely [as] a gift, and partly for fees," subject to a life estate for Hopkins. The respondent paid Attorney Pelech for this service.

Hopkins signed the deed on July 9, 1998, in Attorney Pelech's office. The respondent was also present. Attorney Pelech testified that his understanding was that Hopkins owed the respondent $40,000 in past legal bills and that the conveyance would be in consideration for past and future legal services. The respondent's billing records indicate that Hopkins actually owed $5,305 for the work that had been done on the appeal through May 27, 1998. Attorney Pelech also was unaware that the property being conveyed was the subject matter of the pending appeal.

At the time Hopkins deeded the Rye property to the respondent, she was eighty-one years old and her mental condition was deteriorating. The referee found "overwhelming evidence" that she was "at best, mentally impaired, and at worst, suffering from dementia because of Alzheimer's [disease]." The referee also found "by clear and convincing evidence that [Ms.] Hopkins lacked the mental capacity to make an informed decision about conveying the Rye property to the respondent on July 9, 1998." In reaching this conclusion, the referee relied upon medical evidence as well as the testimony of friends, neighbors, police and nurses who had contact with Hopkins in late 1997 and the first half of 1998.

Hopkins' primary care physician testified that he examined her twice in March 1998 and determined she suffered from "early dementia, probably Alzheimer's disease." She had weeping ulcers on her legs and appeared disheveled, upset and confused. Soon after these examinations, Hopkins was hospitalized because of the leg ulcers and confusion. On April 4, 1998, a psychiatrist examined her and determined that her immediate recall and short-term memory were impaired, her insight and judgment were poor and she was suffering from dementia, most likely of the Alzheimer's type.

Hopkins' neighbor, Mary Lou Lannon, testified that Hopkins, who formerly taught at Connecticut College, was very sharp and well-dressed until September 1997. After that, Hopkins' house was unkempt. By December 1997, Lannon visited Hopkins almost every day. She said that the house was filled with bags, the bed was covered with things Hopkins had bought and there were so many things in the house, a person would have to make a path to get through it. Another neighbor said the house was filled with junk mail, newspapers, magazines and food. Although the respondent visited Hopkins in her home and observed her hoarding behavior, he testified that he did not see it as a problem.

By spring of 1998, Hopkins was unable to use her checkbook to pay bills so that, on some occasions, she had no lights, telephone or hot water. Hopkins also did not bathe and became incontinent. She smelled of urine in public.

A Rye police officer responded to a number of calls at Hopkins' residence in the spring of 1998. He also said the house was cluttered with canned goods, groceries and magazines. On April 13, the officer responded to a call from Hopkins in which she reported that there were two intruders in her bedroom. When the officer arrived at her house, Hopkins insisted that the strangers were still there but the officer checked the bedroom and found no evidence of an intruder.

The respondent testified that the police officer called him on April 14, 1998, regarding the call the previous day and that the officer told him that Hopkins was "very sharp." The officer did not remember making this call.

During this time, Hopkins was also visited by the Visiting Nurses Association (VNA). Their records showed that in June 1998, Hopkins began taking Aricept, a medication for patients with early signs of dementia. Nonetheless, her condition deteriorated. She exhibited confused, rambling speech, loose associations and "echolalia," which causes people to repeat over and over what they have heard. By late June, a nurse noted that Hopkins smelled of urine and was beginning to exhibit signs of fecal incontinence.

Although the respondent and Attorney Pelech both testified that Hopkins was mentally competent to deed her home to the respondent, the referee did not find this testimony credible "[i]n light of the overwhelming evidence to the contrary." Based upon these factual findings, and others set forth below, the referee found that the respondent had violated multiple Rules of Professional Conduct. The referee found that the respondent violated these rules "knowingly, as opposed to negligently and that his conduct caused injury or potential injury to [Ms.] Hopkins."

The referee found as aggravating factors Hopkins' vulnerability, the respondent's selfish motive and his substantial experience in the practice

of law. As mitigating factors, the referee found the respondent's unblemished disciplinary record, his cooperation with the committee's investigation and his character and reputation. The referee recommends that the respondent be suspended from the practice of law for two years.

In a lawyer discipline case, "although we defer to the referee's factual findings if supported by the record, we retain the ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, the appropriate sanction." *Kersey's Case*, 150 N.H. 585, 586, *cert. denied*, 125 S. Ct. 97 (2004) (quotation omitted). We review the findings made by the referee to determine whether a reasonable person could reach the same conclusion based upon the evidence presented. *Id.*

The committee accepted the referee's report but noted that the referee had failed to address its request that the respondent be assessed the expenses incurred in the investigation and prosecution of the petition. In his initial reply to the referee's report, the respondent indicated he "does not challenge the report of the referee and he does not desire to be heard thereon." The respondent, however, objected to the committee's request for assessment of expenses. The committee argues that because the respondent initially did not contest the referee's finding that he violated the Rules of Professional Conduct, the only issue before this court is the appropriate sanction.

After we ordered briefing and oral argument the respondent raised four issues: First, whether there was sufficient evidence to support the referee's finding concerning Hopkins' deteriorating mental condition and respondent's awareness of that condition; second, whether under Rule 1.8(j), the deed conveyed an interest in the property that was the subject of the litigation; third, whether the respondent's estimate of $30,000 for handling Hopkins' case on appeal was clearly excessive; and fourth, whether the Rules of Professional Conduct were used in an improper fashion to create multiple violations out of a single fact pattern.

## I. Waiver

We first address the committee's argument that the respondent waived his right to challenge the referee's finding that he violated the Rules of Professional Conduct by initially indicating that he did not challenge the referee's report and did not wish to be heard. In support of this argument, the committee relies upon *O'Meara's Case*, 150 N.H. 157, 159 (2003), and *Jones' Case*, 137 N.H. 351, 357 (1993). In both cases, however, the respondent argued only the appropriateness of the sanction and never contested the referees' findings concerning substantive violations of the Rules of Professional Conduct.

Construing the respondent's initial acquiescence in the referee's findings and recommendations as limiting the issues he can subsequently raise would create a procedural trap in attorney discipline cases. It may be that the respondent initially accepted the referee's report in hopes that we would also accept the report without briefing and oral argument and would not consider a harsher sanction. The attorney's decision to accept the substantive violations is part of this tactical decision. To penalize the respondent for this tactical decision would discourage other attorneys from accepting the referee's findings in future cases. We thus conclude that because we ordered further briefing and oral argument in this case, the respondent may challenge the referee's findings concerning violations of the Rules of Professional Conduct as well as the recommended sanction.

## II. Hopkins' mental condition

The respondent first challenges the referee's findings concerning Hopkins' mental condition. He points to evidence suggesting that any mental impairment was at an early stage and that Hopkins was responding positively to Aricept. The respondent relies upon, for example, a VNA notation on July 8, 1998, that Hopkins' "overall orientation to time and date improved, secondary to Aricept therapy" and that on July 9, the day she signed the deed, her mental status was recorded as alert and oriented. The respondent's secretary testified that Hopkins was competent when she executed a will on July 9 in the respondent's office and another attorney testified that Hopkins was able to execute two powers of attorney in February 1999. Although there is some evidence to support the respondent's contention, there is also substantial evidence to support the referee's conclusion that Hopkins lacked the mental capacity to make an informed decision about conveying the Rye property to the respondent. We thus defer to the referee's finding on this issue. *See Kersey's Case*, 150 N.H. at 586.

The respondent also argues that there was "substantial evidence" that Hopkins intended to convey the Rye property to him as a gift. He argues that Hopkins had the mental capacity to make this gift based upon the testimony of Donna Williams, an elderly protection worker at the New Hampshire Department of Health and Human Services, and Attorney Pelech's assessment that Hopkins understood the nature of the transaction.

Although the respondent testified that Hopkins proposed to convey the property to him as a gift, the referee found this testimony "not credible" for two reasons. First, unlike many other conversations with Hopkins, the respondent had no handwritten notes concerning their discussions of the cost of the appeal and alternative methods for payment. Second, Lannon

testified that Hopkins told her the respondent wanted to buy her home. Lannon's testimony was corroborated by an entry in her personal journal on May 12, 1998, noting that Hopkins told her that the respondent wanted to purchase the Rye property. Thus, the respondent's claim that Hopkins intended to convey the Rye property to him as a gift is not compelled by the record.

With respect to the respondent's knowledge of Hopkins' condition, the respondent argues that no one informed him of Hopkins' mental deterioration and that "[l]awyers are trained to perform legal services not psychological services." The referee found that at the time of the transaction, the respondent had known Hopkins for twenty years and represented her for eight years, had drafted her will and had a power of attorney for her. He knew Hopkins to be bright, strong-willed and meticulous in her appearance. The referee found, and we agree, that it is not credible that someone who had known and represented Hopkins for this long did not notice that, by the spring of 1998, she had mentally deteriorated to a significant degree. In addition to appearing disheveled and dirty, Lannon testified that Hopkins could not recall why the respondent took her to meet Attorney Pelech in July 1998 or whether she had signed anything at that meeting. Lannon also testified that she informed the respondent that Hopkins could not manage her checkbook and her utilities were turned off because she failed to pay her bills.

Moreover, although there is no documentation showing that the respondent was informed specifically that Hopkins suffered from dementia, the evidence establishes that, at a minimum, he knew that Hopkins was admitted to the hospital in April of 1998, that she was in a car accident on June 29, 1998, that Lannon was concerned that Hopkins was not paying her bills and that she smelled of urine when she signed the deed in Attorney Pelech's office.

To the extent that the respondent asserts that he was "absolutely unaware" of Hopkins' deteriorating mental condition, the referee found by clear and convincing evidence that this was by choice and that the respondent turned a "blind eye" towards Hopkins' mental condition. Indeed, the respondent testified, "[U]nless someone took it upon themselves to tell me that there was something wrong with Natalie Hopkins, there was no way for me to know it." Although he had many opportunities to do so, the respondent made no effort to ascertain whether she had the mental capacity to make informed decisions. For example, when the respondent spoke with Ms. Weibold, a social worker from the VNA, he told her that he saw no need for a case conference for Hopkins and that he was Hopkins' only support. Like the issue of Hopkins' mental

state, the issue of the respondent's knowledge is a factual one. The evidence detailed above supports the referee's finding on this issue.

*III. Rule 1.8(j)*

■ The second issue raised by the respondent is whether he acquired "a proprietary interest" in the litigation he was conducting for Hopkins as prohibited by Rule 1.8(j). The respondent argues that his interest in the Rye property was "not dependent on the outcome of the litigation in any way" because at the time Hopkins deeded the property to the respondent, John Canty, Jr.'s claim against the property had already been dismissed on res judicata grounds by the superior court. The respondent apparently asks us to conclude that because Canty's claim was frivolous, Rule 1.8(j) does not apply. The referee ruled that Rule 1.8(j) has no exception for frivolous claims. We agree.

Rule 1.8(j) provides, in pertinent part: "A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client . . . ." Here, the subject matter of the litigation was the Rye property and Hopkins deeded an interest in that property to the respondent. The respondent cites no authority for his argument that if the cause of action is frivolous, Rule 1.8(j) has no applicability. Moreover, to adopt such an exception would create uncertainty as to the scope of Rule 1.8(j). We therefore reject his argument.

*IV. Rule 1.5(a)*

■ The third issue raised by the respondent is whether there was sufficient evidence to support the referee's finding that his estimated and actual fee for handling the appeal was "clearly excessive" under Rule 1.5(a). To prove a violation of Rule 1.5(a), the committee "must present evidence establishing a generally accepted, reasonable fee for the services in question." *Kelley's Case*, 137 N.H. 314, 320 (1993). "Once a reasonable fee has been determined, the referee, and this court upon review of the referee's findings, will be able to measure the allegedly excessive fee against the reasonable fee to determine whether the fee charged violated Rule 1.5(a)." *Id.* We thus review *de novo* whether the fee was clearly excessive.

The referee relied upon the testimony of the committee's expert, Attorney Elizabeth Cazden, who has handled numerous appeals, including fifty-four reported decisions. Attorney Cazden testified that a reasonable fee for the Canty appeal would be in the "five to ten thousand dollar range" but could be as much as $12,000. She based this opinion on several factors including that the respondent's fee at the superior court level was

under $3,000, there was no transcript to review because the issue was purely legal, the respondent was already familiar with the case and, because he represented the appellee, he only had to respond to the appellant's arguments. Attorney Cazden also testified that a typical State supreme court appeal would require between thirty and seventy-five hours of work by the attorney.

Review of the respondent's billing records showed that he billed 225 hours to write the brief, including "day after day after day of anywhere from ten to eighteen hours," and eighty-five hours to prepare for the oral argument. During his two-week vacation in July 1998, the respondent billed forty-nine hours reviewing twenty-four cases cited in the appellant's brief while he was out of town without access to research facilities. The respondent admitted that his billing records reflect a combination of his hours and his paralegal's and secretary's time and that all of the time was billed at the rate of $175 per hour. Attorney Cazden concluded that both the estimated fee of $30,000 and the actual fee of $64,242.89 charged for the appeal were clearly excessive.

The respondent's brief completely ignores Attorney Cazden's testimony. The respondent instead relies upon the testimony of Attorney Pelech and the respondent's expert, Attorney John McGee. McGee testified that in his opinion, the estimated fee of $30,000 was not unreasonable. Pelech testified that fees for appeals vary considerably and that in one case, he charged a client $12,000 for an appeal when another firm had quoted the same client a fee of $35,000. The respondent also relies upon the fact that he received $33,000 in 2001 as a settlement of the fees Hopkins' estate owed to him.

With respect to the probative value of the settlement, we note that the settlement was for "the value of services to the decedent during her lifetime." Thus, the settlement included not only the fee for the appeal but other services as well. More fundamentally, the amount of a settlement is of little probative value on the reasonableness of a fee. *See* N.H. R. Ev. 408 (making inadmissible into evidence the compromise of a claim to prove its amount).

Neither of the respondent's witnesses squarely addressed the actual fee. McGee testified about a $30,000 fee, which was only the estimated fee and retainer in this case. Pelech's comparison of his fee in one case to the fee charged by another firm was of little probative value. We thus agree with the referee that Attorney Cazden's testimony was more persuasive and we adopt his finding that the respondent's fee was clearly excessive.

*V. Rule 8.4(a)*

█ Finally, the respondent argues that "[t]he rules of [professional] conduct should not be used in a prosecutorial fashion to create multiple violations out of a single fact pattern," and that Rule 8.4(a), which states that it is professional misconduct for a lawyer to violate any of the other Rules, is duplicitous and "destroys professional livelihoods and reputations." We need not address this argument, however, because "[t]he gravity of unprofessional conduct is not determined solely by the number of rules broken or by the particular rules violated, but is determined largely with reference to the attorney's behavior." *Flint's Case*, 133 N.H. 685, 689 (1990).

We thus reject the respondent's contention that Hopkins had the mental capacity to deed the Rye property to him as a gift and that he did not know that her mental condition had deteriorated at the time of the conveyance. We adopt the referee's findings that the respondent violated the following Rules of Professional Conduct:

> (1) Rule 1.4(b) by failing to explain to his client the legal and practical aspects of a matter and alternative courses of action;

> (2) Rule 1.5(a) by charging his client a clearly excessive fee;

> (3) Rule 1.7(b) by allowing his representation of his client to be materially limited by his own interests;

> (4) Rule 1.8(a)(1) by knowingly acquiring an interest adverse to his client and entering into a transaction with his client, the terms of which were unreasonable to her;

> (5) Rule 1.8(b) by using information related to the representation of his client to her disadvantage and without her informed consent;

> (6) Rule 1.8(j) by acquiring a proprietary interest in the subject matter of litigation in which he was representing his client;

> (7) Rule 2.1 by failing to exercise independent professional judgment in rendering advice to his client; and

> (8) Rule 8.4(a) by violating the Rules of Professional Conduct.

*VI. Sanction*

Having found that the respondent violated the Rules of Professional Conduct noted above, we next consider the appropriate sanction. In exercising our authority, we are mindful that discipline is not intended as a

mode of inflicting punishment for an offense. *O'Meara's Case*, 150 N.H. at 159. Rather, its purpose "is to protect the public, maintain public confidence in the bar, preserve the integrity of the legal profession, and prevent similar conduct in the future." *Id.* (quotation omitted). The sanction we impose must take into account the severity of the misconduct. *Id.*

Although we have not adopted the ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS (1992) (STANDARDS), we look to them for guidance. *Feld's Case*, 149 N.H. 19, 28 (2002), *cert. denied*, 540 U.S. 815 (2003). The STANDARDS set forth the following factors for courts to consider in imposing sanctions: "(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." STANDARDS, *supra* § 3.0; *see Kersey's Case*, 150 N.H. at 587.

The respondent violated Rules 1.7 and 1.8 by allowing his representation of Hopkins to be materially limited by his own interests, knowingly acquiring an interest adverse to his client, entering into an unreasonable transaction with his client, using information related to the representation of Hopkins to her disadvantage and acquiring a proprietary interest in the subject matter of the litigation. These actions resulted in a breach of the respondent's duty to avoid conflicts of interest. According to the STANDARDS,

> Disbarment is generally appropriate when a lawyer, without the informed consent of [the client] . . . engages in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client.

STANDARDS, *supra* § 4.31(a). Suspension, on the other hand, "is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." *Id.* § 4.32.

Here, the respondent knowingly entered into a transaction with his client that resulted in his acquisition of an interest in Hopkins' real property for substantially less than the fair market value of the property. Even if there was evidence to support the respondent's contention that Hopkins intended to transfer the property as a gift, the respondent failed to ensure that Hopkins obtained detached advice from a lawyer who was fully informed of the circumstances and could independently assess her mental condition. *See* N.H. R. PROF. CONDUCT 1.8 ABA Model Code Comments.

Section 7.0 of the STANDARDS addresses the appropriate sanction to be imposed when a lawyer charges a client unreasonable or improper fees. "Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client ...." STANDARDS, *supra* § 7.1. As discussed above, the respondent's actual and estimated fees for representing Hopkins were clearly excessive and the real estate he received in exchange for his legal services was worth substantially more than the amount that Hopkins owed. Thus, we find that the respondent knowingly engaged in conduct that violated his duties as a professional with the intent to benefit himself.

We also find that the respondent's actions caused serious injury to Hopkins. As a result of the conveyance, the respondent received property that was worth over $200,000 in consideration for a fee that was clearly excessive for the legal services provided. Hopkins and her estate then engaged in a protracted series of lawsuits in order to recover the property.

Before we determine the appropriate sanction, we must also consider aggravating and mitigating factors. As mitigating factors, the referee found: "(1) the respondent's prior unblemished disciplinary record; (2) his cooperation with the [c]ommittee's investigation; and (3) his character and reputation." The referee also found the following aggravating factors: "(1) [Ms.] Hopkins' vulnerability; (2) the respondent's selfish motive; and (3)' his substantial experience in the practice of law." *See* STANDARDS, *supra* §§ 9.22, 9.32.

We agree with the referee that there are two mitigating factors present in this case; however, we do not ascribe them significant weight. We acknowledge that good character and reputation are mitigating factors. *See* STANDARDS, *supra* § 9.32(g). In addition, "[a]bsence of a prior disciplinary record is an acknowledged mitigator, but it does not dispense with the necessity for disciplinary action." *Jones' Case*, 137 N.H. at 360.

We disagree, however, with the referee's finding that the respondent's level of cooperation is a mitigating factor in this case. First, "a lawyer has a professional duty to cooperate with the committee's investigation." *Richmond's Case*, 152 N.H. 155, 161 (2005). Second, the referee found, and we agree, that the respondent's testimony concerning Hopkins' mental condition and his knowledge of her deteriorating health was not credible. Third, the respondent has failed to acknowledge the wrongfulness of his actions and has not shown the level of remorse that we have found to be mitigating in other cases. *Cf. O'Meara's Case*, 150 N.H. at 159; *Kalil's Case*, 146 N.H. 466, 467 (2001).

With regard to aggravating factors, we agree that the respondent acted selfishly by charging excessive fees and entering into a transaction with his client, the terms of which were unreasonable to her. The respondent's conduct was particularly egregious in light of Hopkins' vulnerability due to her declining mental health. We agree with the referee that substantial experience in the practice of law is an additional aggravating factor. STANDARDS, *supra* §§ 9.22(d), 9.22(i); *see also Richmond's Case*, 152 N.H. at 161. Furthermore, the respondent has not accepted responsibility for his ethical violations, but has instead maintained that he followed the proper procedure in arranging for Hopkins to deed the Rye property to him as a gift. *See* STANDARDS, *supra* § 9.22(g). We find that these important aggravating factors justify an increase in the level of sanction recommended.

In light of the serious injury suffered by Hopkins and the significant aggravating factors present in this case, we disagree with the referee that a two-year suspension is an adequate sanction. Rather, we conclude that disbarment is necessary for the protection of the public and the preservation of the integrity of the legal profession. *See* SUP. CT. R. 37(13)(f) (2003; amended 2003). The conduct of a lawyer who selfishly takes advantage of an elderly, mentally ill client by charging an exorbitant fee and then relies upon less than forthright testimony to defend his conduct requires disbarment. Accordingly, the respondent is hereby disbarred and is ordered to reimburse the committee for all of its expenses, including legal fees, incurred in investigating and prosecuting this matter. *See* SUP. CT. R. 37(16) (2003; amended 2003).

*So ordered.*

BRODERICK, C.J., and GALWAY, J., concurred; HORTON, J., retired, specially assigned under RSA 490:3, concurred.