Original
No. LD-2003-004

# DOUGLAS' CASE

Argued: November 13, 2007
Opinion Issued: December 28, 2007

*Abramson, Brown & Dugan,* of Manchester (*Kenneth C. Brown* and *Jared R. Green* on the brief, and *Mr. Green* orally), for the Committee on Professional Conduct.

*Caroline G. Douglas,* of Concord, by brief, *pro se.*

BRODERICK, C.J. On July 11, 2003, the Supreme Court Committee on Professional Conduct (committee) filed a petition seeking disbarment of the respondent, Caroline G. Douglas. The Judicial Referee (*Horton,* J.) found by clear and convincing evidence that the respondent violated New Hampshire Rules of Professional Conduct (Rules) 1.15(a)(1), 1.15(c), 8.4(c) and 8.4(a), and recommended a five-year suspension as a sanction. The committee recommends disbarment. We conclude that the respondent's conduct warrants disbarment.

I

The referee made the following findings of fact. On June 14, 1994, Marjorie VanderKruik retained the respondent to represent her in her divorce. The retention agreement provided that VanderKruik would reimburse the respondent's law firm, Douglas & Douglas, for all costs advanced and expenses incurred that were directly related to the legal services provided. The agreement further provided that, each month, the firm would render a statement to VanderKruik that detailed the time and expenses incurred. The agreement provided that "fees for legal services and other chargeable expenses" would be paid upon presentation of the statement "unless [another] mutually satisfactory agreement" was made. Under the agreement, VanderKruik agreed to pay a $5,000 retainer and that the amount of each bill would first be paid out of the retainer account. She also agreed that whenever the retainer was reduced, she could be asked to replenish it. At the end of representation, any balance left in the retainer account would be used to pay the final bill and any portion left over would be returned to VanderKruik. The referee rejected testimony by the respondent that she and VanderKruik later entered into another fee agreement, finding that such testimony lacked credibility.

On June 10, 1997, the respondent's then-husband, Charles Douglas, whom she was in the process of divorcing, filed an attorney's lien against VanderKruik in the amount of approximately $65,000 for services rendered by the law firm of Douglas & Douglas in VanderKruik's divorce. The superior court ordered that issues regarding the validity, amount and

payment of the lien would be determined in the respondent's divorce case, not in VanderKruik's divorce case.

The final decree in VanderKruik's divorce was entered on June 23, 1997, and judgment in the case was entered on September 8, 1997. The decree awarded VanderKruik the funds in an escrow account held by Attorney Robert Bowers, who represented VanderKruik's ex-husband. VanderKruik intended to use the funds, which were partial proceeds from the sale of the marital home, to pay the remaining debts and financial obligations associated with the sale of the residence, as required by the divorce decree. The respondent suggested to VanderKruik that the funds in the escrow account be forwarded directly to the respondent's trust account so that she could protect them and keep them safe from Mr. Douglas. The respondent told VanderKruik that if the funds were turned over to VanderKruik directly, Mr. Douglas would take them.

On August 18, 1997, Attorney Bowers responded to an inquiry from the respondent about closing the escrow account. He indicated that before he could close the account, he needed a signed statement from VanderKruik requesting the release of the escrow funds. He wrote that if VanderKruik "wishes to have the funds wired to [the respondent's] account, rather than have the account closed out and a check made payable to her, then the statement signed by her should specify that"; otherwise under the escrow agreement he was obligated to ensure that the check was made out to VanderKruik. Consequently, VanderKruik signed a statement on August 18, 1997, requesting that Attorney Bowers authorize the bank to wire the balance of the escrow account to the respondent's trust account. On August 25, 1997, the bank completed the wire transfer of $49,790.44 from the escrow account.

On September 15, 1997, a hearing was held in the respondent's divorce case. Instead of attending the hearing, the respondent went to the bank and withdrew the $49,000 from her trust account that Attorney Bowers had wired to her, leaving approximately $790. The respondent testified that she withdrew the $49,000 because she had a "premonition" that if she did not do so, Mr. Douglas "would take it somehow." She took the money in cash, converted it into Traveler's Checks and put them into a safe. She testified that she took the money from the trust account as her fee. She justified taking the money because she was "in a cash crunch" and "really needed [it]," in contrast to VanderKruik, who was living with a multi-millionaire boyfriend who had "taken care of her for years."

Shortly after withdrawing the money, the respondent spent approximately $22,000, paying fees to new attorneys who were taking her clients, paying her payroll and paying her operating bills. She did not hold any of the $49,000 in anticipation of a dispute about its disposition between

her and VanderKruik, between her and Mr. Douglas, or between VanderKruik and Mr. Douglas. At approximately 4:00 p.m. on September 15, 1997, Mr. Douglas moved *ex parte* for an attachment of the respondent's trust account, alleging that a partner of his was at the respondent's bank at 10:00 a.m. that day and heard the respondent discussing withdrawing $49,000 from that account. The court granted the motion, ordering that the respondent not cash or negotiate or otherwise withdraw any funds she held for VanderKruik until further court order.

On September 17, 1997, the respondent sent VanderKruik a letter advising that Mr. Douglas had "placed an attachment on all of the Law Office of Caroline G. Douglas bank accounts," which included "the account in which I hold your trust funds." The respondent told VanderKruik that the attachment affected the respondent's and VanderKruik's access to VanderKruik's funds. The letter did not inform VanderKruik that, before the attachment was issued, the respondent had withdrawn the $49,000 that had been wired to the respondent for VanderKruik's benefit.

On September 22, 1997, the respondent sent another letter to VanderKruik, informing her that the respondent was closing her law practice and advising her to obtain another attorney. She also advised VanderKruik that she would "work to obtain a release of the attachment of your funds if your funds have been improperly attached by Charles Douglas." She further informed VanderKruik that her billing department would send a final accounting within two weeks and that she would "forward the balance of [VanderKruik's] retainer account." The respondent did not inform VanderKruik that, in fact, she had already withdrawn the $49,000 from her trust account and applied it to VanderKruik's fees.

On September 23, 1997, the respondent informed VanderKruik by letter that she was claiming and attaching the proceeds of the escrow account previously held by Attorney Bowers and that she had a "lien of approximately $50,000" on the proceeds. She requested that VanderKruik contact her immediately to "arrange a written agreement for installment payments" on the outstanding bill. She did not inform VanderKruik that she had already taken the proceeds of the escrow account and was in the process of spending them. The referee found that, based upon this correspondence, VanderKruik reasonably believed that the $49,000 remained in the trust account.

In addition, on October 8, 1997, VanderKruik wrote to the superior court asserting that, as of that date, the respondent was "keeping an escrow account in the amount of $49,790.44, which [Mr.] Douglas has attached" and requested the court "not release the money in the escrow account" to either the respondent or Mr. Douglas, "since it's not theirs to have."

The respondent testified that she called VanderKruik on her cell phone on September 15, 1997, shortly after she took the money and told her that she "just went to the bank, because I had a feeling that I needed to take the forty-nine thousand dollars" to "protect" it. VanderKruik denied that this phone call ever took place. She also denied giving the respondent permission to apply the $49,000 to her fees. She testified that had the respondent asked her permission, she would have refused it because she "needed the money to pay my taxes and other financial obligations" and because her bill with the respondent had not yet been reconciled.

The referee concluded that VanderKruik's version of the events was more credible than that of the respondent. The referee found that VanderKruik would not have written the letter to the court on October 8, 1997, if, on September 15, 1997, the respondent had informed her that the respondent had withdrawn the $49,000 from the trust account. Furthermore, the referee found that the respondent would not have written the September 23, 1997 letter, telling VanderKruik that she had asserted a lien of approximately $50,000 on the proceeds in the escrow account if, on September 15, 1997, she had told VanderKruik that, in fact, she had withdrawn all but $790 from that account. The referee rejected the respondent's claim that the phone records showing that she called VanderKruik on September 15, 1997, "disappeared," and additionally found that if, as the respondent asserted, she had a standing agreement with VanderKruik to withdraw funds from her trust account as her fees were earned, it was not credible that the respondent would have believed it necessary to inform VanderKruik that she withdrew the $49,000.

In late May 1997, VanderKruik had received a bill from the respondent in the amount of $59,155.20 for services rendered between April 10, 1997, and May 21, 1997. The bill indicated that the total amount remaining in VanderKruik's retainer account was $1,000. At the respondent's request, VanderKruik sent an additional $10,000 to be deposited in the retainer account. At some point, VanderKruik expressed concerns about the May bill and asked the respondent for more detail. The respondent gave her an income-expense worksheet, which VanderKruik reviewed. She informed the respondent that she had several questions and concerns about the respondent's fees, and absent an explanation from the respondent, she refused to pay the bill.

The respondent and VanderKruik had several heated conversations in August and September 1997 about payment of the bill. In late August 1997, the respondent sent VanderKruik another copy of the income-expense worksheet and asked her to "annotate any questions or discrepancies." In this letter, the respondent informed VanderKruik that she needed to make "some arrangement" to pay off her final bill. On

September 5, 1997, the respondent sent VanderKruik another copy of the income-expense worksheet, asking for the same information. Although the retainer agreement between the respondent and VanderKruik required the respondent to send itemized statements on a monthly basis, VanderKruik did not receive any itemized statements from September 1997 through December 1997, and never received a final bill. The respondent asserted that this was because VanderKruik would not cooperate and that VanderKruik "knew roughly what her bill was."

On January 7, 1998, VanderKruik wrote to the fee dispute resolution committee of the New Hampshire Bar Association, alleging that there were "many errors" in the expense sheet that the respondent had given her. She stated that "[a]s of now [the respondent and Mr. Douglas] have received in excess of $115,000.00 and it looks like between the two of them, they are looking for another $120,000.00. They have already taken far more than they are entitled to." She requested help from the bar association because she "ha[d] a very difficult time standing [her] ground when [the respondent] starts yelling at [her]," and she was unable to afford legal counsel.

Soon after VanderKruik's letter to the bar association, the respondent answered a number of VanderKruik's questions about her legal bill and sent a billing statement which, for the first time, documented the fact that she had taken the $49,000 as her fee. The respondent and VanderKruik eventually reached an agreement regarding the fees.

## II

The referee found, by clear and convincing evidence, that the respondent violated: Rule 1.15(a)(1) by failing to safeguard certain funds belonging to her client and by removing those funds from her trust account without her client's permission; Rule 1.15(c) because she withdrew the funds and applied them to her fees despite the fact that the respondent and VanderKruik disagreed as to whether the $49,000 should be applied to VanderKruik's bill; Rule 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation by writing letters to VanderKruik that misrepresented the status of the funds; and Rule 8.4(a), which prohibits an attorney from violating any of the Rules.

"[A]lthough we defer to the referee's factual findings if supported by the record, we retain the ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, the appropriate sanction." *Coffey's Case*, 152 N.H. 503, 507 (2005) (quotation omitted). "We review the findings made by the referee to determine whether a reasonable person could reach the same conclusion based upon the evidence presented." *Id.* "It is not our role to make

independent findings and substitute them for the judgment of the referee." *Sheridan's Case*, 146 N.H. 736, 738 (2001) (quotation and brackets omitted).

Rule 1.15(a)(1) requires an attorney to: (1) hold the property of clients or third persons separate from the lawyer's own property; (2) deposit funds in one or more clearly designated trust accounts in accordance with the provisions of the New Hampshire Supreme Court Rules; (3) identify all other property as property of the client, promptly upon receipt; and (4) safeguard that property. The duty to safeguard property means that "[a] lawyer may not use a client's or third party's funds for his own or his law firm's purposes. Such misuse is conversion." ABA/BNA LAWYERS' MANUAL ON PROFESSIONAL CONDUCT 45:501 (Jan. 24, 2007). "Conversion in the extreme sense occurs when a lawyer intentionally takes or uses client funds for his own or the law firm's use." *Id.* Applying client funds to the client's bill without permission is an example of conversion. *See id.*

■ The referee found that on August 25, 1997, Attorney Bowers wired $49,790.44 from an escrow account he was maintaining in connection with VanderKruik's divorce to the respondent's trust account and that such money was VanderKruik's property as set forth in her divorce decree. Instead of safeguarding this money, which she was keeping in trust for her client, the respondent withdrew the money from the trust account, without her client's knowledge or permission, and applied it to her legal fees. We hold, based upon the evidence presented, that the referee's factual findings are reasonable and that the respondent violated Rule 1.15(a)(1).

Under Rule 1.15(c), when "[i]n the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved." Under this Rule, "if two or more persons (including the lawyer) claim interests in the same property, the lawyer must segregate the disputed assets until the dispute is resolved. The lawyer cannot unilaterally seize the property, even if the lawyer believes that she has a valid retaining lien." ABA/BNA LAWYERS' MANUAL ON PROFESSIONAL CONDUCT 45:1101 (July 25, 2007). "A lawyer may not in the event of a fee dispute unilaterally withdraw her fees from the client funds." *Id.* at 45:1112. "Instead, the disputed amount of the fee should be left untouched in the client trust fund until the dispute is resolved in court, by an arbitrator, or by the parties." *Id.*

■ The referee found that both VanderKruik and the respondent claimed an interest in the $49,000, that there was a dispute between them

about the respondent's fees, and that when the respondent took the money as fees, VanderKruik's concerns and questions about the respondent's fees had not been resolved. The referee concluded that, "[u]nder these circumstances, the respondent violated Rule 1.15(c) when, instead of leaving the funds in her trust account until these disputes were resolved, she withdrew the funds and applied them to her fees." The record supports the referee's factual findings, and we conclude that the respondent violated Rule 1.15(c).

Under Rule 8.4(c), it is professional misconduct for an attorney to engage in conduct involving dishonesty, fraud, deceit or misrepresentation. "A basic premise of Rule 8.4(c) is that a lawyer may not make misrepresentations to a client, tribunal, or others." ABA/BNA LAWYERS' MANUAL ON PROFESSIONAL CONDUCT 101:402 (Jan. 21, 1998). "A lawyer's failure to disclose important information may constitute misconduct under this rule." *Id.* Moreover, "[m]isuse of funds entrusted to a lawyer is dishonest conduct that violates this rule." *Id.* at 101:403.

■ The referee found that the respondent violated this Rule by writing letters to VanderKruik dated September 17, 1997, and September 23, 1997, that misrepresented the status of her client's funds. In the September 17 letter, the respondent led VanderKruik to believe that the funds she received from Attorney Bowers remained in her trust account despite the fact that the respondent had withdrawn $49,000. In the September 23 letter, the respondent again led VanderKruik to believe that the funds wired to her by Attorney Bowers remained in her trust account when she informed VanderKruik that she was claiming and attaching the proceeds from the escrow account and asserting a lien on them in the amount of approximately $50,000. Based upon the evidence presented, we hold that the referee's factual findings were reasonable, and that the respondent violated Rule 8.4(c).

Finally, we conclude that the respondent violated Rule 8.4(a), which prohibits an attorney from violating any of the Rules.

## III

Although the referee concluded that disbarment is the proper sanction for a violation of Rule 1.15(a)(1), he recommended, based upon mitigating factors, that we suspend the respondent from the practice of law in New Hampshire for five years. The committee contends that disbarment is the appropriate sanction in this case. The respondent asserts that both the referee's and the committee's recommendations are "excessive and overly harsh."

■ "We retain the ultimate authority to determine the appropriate sanction for a violation of the rules governing attorney conduct." *Morgan's Case*, 143 N.H. 475, 476-77 (1999). "When determining whether to impose the ultimate sanction of disbarment, we focus not on punishing the offender, but on protecting the public, maintaining public confidence in the bar, preserving the integrity of the legal profession, and preventing similar conduct in the future." *Nardi's Case*, 142 N.H. 602, 606 (1998). "In deciding the appropriate sanction, we consider the case on its own facts and circumstances." *Wolterbeek's Case*, 152 N.H. 710, 714 (2005).

We look to the ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS (1992) (STANDARDS) for guidance. *See Richmond's Case*, 152 N.H. 155, 160 (2005). Under the STANDARDS, courts are to consider the following factors when imposing sanctions: "(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." STANDARDS, *supra* § 3.0. "In the case of multiple charges of misconduct, the ABA recommends that the sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations; it might well be and generally should be greater than the sanction for the most serious misconduct." *Richmond's Case*, 152 N.H. at 160 (quotation omitted).

■ The referee concluded that the respondent knowingly violated the duty to preserve her client's property, the duty to be candid and the duty to maintain personal integrity, and that her conduct caused injury or potential injury to VanderKruik. As the referee found, "the respondent knowingly converted Ms. VanderKruik's property when she withdrew the $49,000 from her trust account, without Ms. VanderKruik's knowledge or permission, and applied it to her fees." Accordingly, disbarment is the proper sanction. STANDARDS, *supra* § 4.11; *see Coddington's Case*, 155 N.H. 66, 68 (2007). "An attorney's misuse of funds entrusted to him demonstrates such lack of common honesty as to clearly justify an attorney's disbarment." *Nardi's Case*, 142 N.H. at 606 (quotation omitted).

■ Based upon mitigating factors including personal or emotional problems, delay in disciplinary proceedings, and imposition of other penalties and sanctions, the referee recommended that the respondent be suspended for five years. *See* STANDARDS, *supra* § 9.32. We acknowledge that the respondent's personal or emotional problems are a mitigating factor. *See Grew's Case*, 156 N.H. 361, 367 (2007). However, we do not agree that the delay in disciplinary proceedings presents a mitigating factor in this case. STANDARDS, *supra* § 9.32(j). Here, the time it has taken for these proceedings to reach finality is the result of a lengthy discovery

process that was complicated by VanderKruik's absence from the state, the committee's difficulty contacting the respondent, time spent on a medical evaluation of the respondent's fitness to practice law, and the overlapping investigation and prosecution by the committee of the respondent's misconduct in a separate disciplinary matter. Under these circumstances, we decline to find that the delay in disciplinary proceedings presents a mitigating factor. *Cf. Wolterbeek's Case*, 152 N.H. at 716 (rejection of respondent's argument that ten-year "passage of time" since his misconduct was a mitigating factor). As to the fact that the respondent is currently suspended from practicing law because of a separate disciplinary action, "[t]o suggest that prior sanctions on unrelated matters occurring in the same general time frame as the case before us render any further sanction unnecessary misses the mark. Sanctions relate to conduct, not to time periods. Independent violations warrant discrete sanctions." *Sheridan's Case*, 146 N.H. at 739.

■ Weighing against the mitigating factors are several serious aggravating factors. The referee found the presence of aggravating factors including prior disciplinary offenses, dishonest or selfish motive, pattern of misconduct, and refusal to acknowledge the wrongful nature of her misconduct. *See* STANDARDS, *supra* § 9.22. "[T]he fact that the respondent has had other disciplinary actions constitutes an aggravating circumstance." *Wolterbeek's Case*, 152 N.H. at 717. In 2002, the respondent was disciplined by this court for engaging in strikingly similar behavior. *Douglas' Case*, 147 N.H. 538 (2002). In that case, the respondent was maintaining an escrow account for her client, Mr. Foster, whom she was representing in his divorce. *Id.* at 539. There was a dispute between Foster and his ex-wife about to whom and in what proportion the funds belonged. *Id.* at 539-40. Without obtaining her client's authorization and before the dispute between Foster and his spouse was resolved, the respondent withdrew the funds from the escrow account and applied them to her bill. *Id.* at 540. She failed to inform Foster that she had done this and, in fact, wrote a letter to him shortly thereafter that led him to believe that the escrow account remained intact. *Id.*

We affirmed the referee's findings that because there was a dispute as to whether Foster should receive the entire amount of the escrow funds, the actions of the respondent in withdrawing the entire escrow account and applying them to Foster's legal fees violated Rule 1.15(c). *Id.* at 544. We also agreed "with the referee's conclusion that by withdrawing the escrow funds without her client's permission and by failing to keep the funds segregated until an accounting occurred, the respondent violated Rule 1.15(a)(1)." *Id.* Based upon these violations and "the respondent's

inability to comprehend that her conduct violated her ethical obligation to safeguard her client's funds," we suspended the respondent from the practice of law for a period of six months. *Id.* at 545-46.

When the respondent withdrew VanderKruik's funds from her trust account, as when she similarly withdrew Foster's funds, "there was no arguable question of professional duty because Rules 1.15(a)(1) and 1.15(c) clearly articulate that the funds should have been maintained in the escrow account." *Id.* at 545 (quotation omitted). The respondent was aware when she withdrew VanderKruik's funds that two attorneys and a superior court judge had made professional conduct complaints against her based upon her unilateral withdrawal of Foster's funds.

In addition, the record supports the existence of other aggravating factors, including evidence of a dishonest or selfish motive in that the respondent stole money from her client to use for her own personal needs and lied to cover up her actions, *Wolterbeek's Case,* 152 N.H. at 717, a pattern of misconduct, and the respondent's refusal to acknowledge the wrongful nature of her conduct, *see Coffey's Case,* 152 N.H. at 515. To those factors we also add that this case presents the commitment of multiple violations of the Rules, "an aggravating factor that justifies an increase in the degree of discipline imposed." *Richmond's Case,* 152 N.H. at 161; *see Wolterbeek's Case,* 152 N.H. at 717.

After considering all of the relevant factors, we find that disbarment is the only sanction that attains the goals of the attorney discipline system to protect the public, maintain public confidence in the bar, preserve the integrity of the legal profession and prevent similar conduct in the future. *Wolterbeek's Case,* 152 N.H. at 717. We order the respondent disbarred and order her to reimburse the committee for its expenses in investigating and prosecuting this case, *see* SUP. CT. R. 37(16) (repealed and replaced effective Jan. 1, 2004, by Rule 37(19)).

*So ordered.*

DALIANIS, DUGGAN and GALWAY, JJ., concurred.