Public Protection Fund Committee
No. 2012-300

APPEAL OF DAVID STACY
(New Hampshire Bar Association Public Protection Fund Committee)

Argued: January 16, 2013
Opinion Issued: March 29, 2013

*Law Office of Steven M. Latici, P.A.*, of Gilmanton (*Steven M. Latici* on the brief and orally), for the petitioner.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Thomas Quarles, Jr.* and *Anna B. Peterson* on the brief, and *Mr. Quarles* orally), for the respondent.

LYNN, J. The petitioner, David Stacy, appeals the decision of the New Hampshire Bar Association Public Protection Fund Committee (PPFC) denying his claim for reimbursement for the fees and costs that he and his conservatorship estate paid to attorney Donald Wyatt. The PPFC found that the petitioner failed to demonstrate that the funds at issue were lost as a result of Wyatt's embezzlement, conversion, or theft. We affirm.

In *In re Proposed Public Protection Fund Rule*, 142 N.H. 588 (1998), we adopted Supreme Court Rule 55(2), which directs the New Hampshire Bar Association to establish the Public Protection Fund (PPF). The PPF is "a reimbursement mechanism for proven losses resulting from embezzlement, conversion, or theft of client funds by lawyers." SUP. CT. R. 55(2). "[V]ictims who have lost money or property as the result of the defalcation of the lawyer" may petition the PPF for reimbursement, "explain[ing] specifically the defalcations which led to the losses in question." SUP. CT. R. 55(3), (4). The PPFC may hold a hearing on the petition, at which "[t]he claimant shall bear the burden of proving each element of the claim, including the amount of the claimant's loss, by a preponderance of the evidence." Public Protection Fund Reg. 500.13.[1] The PPFC then issues a written decision explaining its reasons for approving or denying the claim. *Id.* 500.18.

---

[1] *See* Regulations of the New Hampshire Bar Association Public Protection Fund Committee, *available at* http://www.nhbar.org/for-the-public/public-protection-fund-committee-regulations.asp (02/07/2013).

A claim may be brought only against a lawyer who "has been suspended or disbarred from practice; or . . . has died or been judged mentally incompetent before the suspension or disbarment proceedings have been commenced or concluded." SUP. CT. R. 55(3). Additionally, a claim "must be submitted within three years of the time when the victim discovered or first reasonably should have discovered the defalcations and the resulting losses." *Id.* Recovery on a claim is now capped at $250,000, SUP. CT. R. 55(4), although when Stacy filed his claim with the PPFC, the cap was $150,000.

I

The underlying facts are set forth in large part in *Wyatt's Case*, 159 N.H. 285 (2009). Beginning in the spring of 1998, Wyatt served as personal counsel to the petitioner. *Wyatt's Case*, 159 N.H. at 289. In 2001, the petitioner sought a voluntary conservatorship for himself and the appointment of Michel Brault as his conservator. *Id.* at 290. Wyatt counseled the petitioner throughout this process. *Id.* The Carroll County Probate Court approved the petition and appointed Brault as conservator. *Id.* Brault, acting on the petitioner's behalf, entered into four agreements for legal services with Wyatt's firm, Wyatt & Theroux, PC. Brault signed one of the agreements pursuant to a power of attorney granted by the petitioner; this agreement pre-dated Brault's appointment as conservator. Brault signed the remaining three agreements as conservator.

On March 18, 2003, Brault. resigned as conservator, *id.* at 305, and, eventually, the probate court appointed the petitioner's sister, Deborah Stacy, in his place. *Id.* at 296. In May 2003, Ms. Stacy filed a professional conduct complaint against Wyatt for having a conflict of interest when simultaneously representing the conservatorship estate and the petitioner. *Id.* at 296-97. As a result, the attorney discipline office charged Wyatt with violating NEW HAMPSHIRE RULES OF PROFESSIONAL CONDUCT 1.7 (amended 2007), 1.9 (amended 2007), and 8.4(a). *Id.* at 297.

Ms. Stacy also objected to the inventory and accounts that Brault filed with the probate court on behalf of the conservatorship in June 2002 and May 2003. On July 13, 2005, the probate court found that "Brault breached his fiduciary obligations in numerous ways, to varying degrees, during his management of [the petitioner's conservatorship] estate." The probate court found that, among other breaches, Brault wasted estate assets on Wyatt's legal fees "when it was clear that Wyatt was in a clear conflict of interest position" and the petitioner had objected to Wyatt's continued representation of the conservatorship estate. The probate court stated:

> Consequently, payments for administrative support by Wyatt and attorney fees and costs paid to Wyatt were not proper expenses of

the conservatorship estate and must be reimbursed to the estate by Brault. Payment of attorney fees to Wyatt out of the conservatorship estate . . . were a waste and misapplication of conservatorship assets. . . . As conservator, Brault had a fiduciary duty to see to the proper application of [the petitioner's] resources . . . . Brault failed miserably in this regard and should reimburse the conservatorship estate for those failures, *except to the extent, if any, Wyatt reimburses the conservatorship estate for fees and costs disallowed to him,* as hereinafter stated.

Because of Wyatt's inherent conflict of interest . . . , the [*In re Estate of McCool,* 131 N.H. 340 (1988)] decision . . . essentially instructs this Court to disallow all fees and costs incurred and paid to Wyatt . . . . [The petitioner] identifies the total amount for all fees paid to Donald Wyatt . . . as being $175,012.82. . . . [The petitioner] identifies the total amount of administrative support fees and costs paid to Wyatt . . . at $16,071.00. While the Court has not tried to add up all the various separate amounts of fees, legal and administrative, as well as all costs shown in various amounts in the multiple exhibits presented in relation to [the] question of Wyatt's fees, the Court will accept the representation being made by the requests and supporting exhibits as being reasonably accurate and supported by the evidence presented overall, as well as reasonable inferences to be derived therefrom. Therefore, *Donald Wyatt is ordered to reimburse the conservatorship estate for all fees and costs paid to him, in the amount of $175,012.82, and administrative support fees and costs in the amount of $16,071.00.*

(Quotation omitted; emphasis added.) The probate court ordered Wyatt to repay $191,083.82 to the estate and, in case of Wyatt's nonpayment, directed Brault to make the payment.

Significantly, although he was ordered to reimburse the conservatorship estate for all fees and costs paid to him, Wyatt was not a party to the proceedings before the probate court. *See In re Wyatt,* 368 B.R. 99, 101 (Bankr. D.N.H. 2007). Additionally, Wyatt was involved in bankruptcy proceedings at the time. *Id.* The petitioner filed a claim against Wyatt in those proceedings, but the bankruptcy court disallowed it because the petitioner failed to appear at a hearing. *Id.*

On November 2, 2005, the petitioner submitted a claim to the PPFC, setting forth $191,083.82 as "the total amount of the actual theft" and describing the manner of the loss by referring to the probate court order. The petitioner stated that he first discovered "losses from Wyatt's actions

by order of the Carroll County Probate Court dated July 13, 2005." Because Supreme Court Rule 55(4) provides that a claim may be brought only against a lawyer who has been suspended or disbarred, the PPFC held the petitioner's claim in abeyance pending the resolution of Wyatt's disciplinary action.

In September 2005, shortly before he filed his claim with the PPFC, the petitioner brought suit against Brault's probate bond insurance company, eventually settling for $275,000 of the $400,000 bond. The release that the petitioner signed on May 19, 2006 provided: "this release includes all claims for attorneys fees and other legal expense or cost, interest, . . . and all claims described in the order of the Carroll County Probate Court (Patten, J.) of July 13, 2005."

In September 2009, disciplinary proceedings against Wyatt concluded. *See Wyatt's Case*, 159 N.H. at 309. We found that Wyatt operated under a conflict of interest when he simultaneously represented the conservatorship estate and the petitioner, and that the petitioner's interests were materially adverse to Brault's interests as conservator. *Id.* at 305. Wyatt was suspended from the practice of law for a period of two years for the "continuous and knowing violations of his duties of loyalty." *Id.* at 309. "In violating Conduct Rules 1.7(a) and 1.9, [Wyatt] undertook and persisted in representations which he knew or should have known were improper. Other attorneys twice pointed out the conflicts of interest." *Id.* at 308.

We did not disbar Wyatt because he did not "act pursuant to some selfish or improper motive." *Id.* at 309. "While [Wyatt] improperly favored Brault's and [the petitioner's wife's] interests, the reasonableness of [his] fear for [the petitioner's] welfare was never questioned in these proceedings and mitigates much, though not all, of his misconduct." *Id.* Unlike the probate court, we did not direct Wyatt to forfeit the fees he had collected from the petitioner and the conservatorship estate. The Professional Conduct Committee (PCC), which prosecuted the disciplinary action, had waived the argument that Wyatt violated Conduct Rule 1.5(a) by charging illegal fees while operating under a conflict of interest. *Id.* at 305-06.

After Wyatt's suspension, the PPFC brought forward the petitioner's claim and scheduled a hearing on the merits for August 26, 2010. Prior to the hearing, the PPFC requested additional information, including whether a claim had been made against the $400,000 surety bond. The petitioner responded that he settled with the bond carrier for $275,000. The PPFC then cancelled the August 2010 hearing; it directed the petitioner "to show cause why his claim should not be dismissed on the grounds that he has made a full recovery of his claimed damages from a third party."

The petitioner responded that the release operated on all claims against Brault rather than Wyatt. In a further response dated September 7, 2010,

the petitioner also raised new claims, in addition to the loss of $191,083.82 named in his original claim. These new claims related to: legal fees paid to attorneys in Texas, a car loan secured by the petitioner's automobile, proceeds from a loan issued to Wyatt, proceeds from the foreclosure sale of the petitioner's home, and a loan issued to the conservatorship estate but deposited into Wyatt's account.

The PPFC scheduled a hearing to address: (1) why the petitioner settled the bond for less than $400,000; (2) why the petitioner's claim should not be reduced proportionately by his settlement; and (3) whether the funds subject to the claim were paid to Wyatt as a result of Wyatt's defalcation, embezzlement, conversion, or theft. The PPFC ruled that the petitioner's new claims were untimely because he did not raise them until September 2010. *See* SUP. CT. R. 55(3).

After a hearing on May 24, 2011, the PPFC ruled that it would reduce the petitioner's claim by the portion of his recovery on the bond that the probate court found to be attributable to attorney's fees. The PPFC rejected the petitioner's arguments that the probate court found that Wyatt committed conversion and/or theft when he collected fees for his representation of the petitioner, the conservatorship, and Brault, and that the PPFC was bound by these findings.

Following a further hearing, the PPFC undertook an independent calculation of the petitioner's claim, noting that the probate court accepted the parties' representations without reviewing them. The PPFC concluded that the petitioner had proved only $173,849.73 in attorney's fees and expenses paid to Wyatt during the period at issue in his claim. The PPFC offset that amount by $36,481.00 representing the proportion of the petitioner's recovery on the probate bond attributable to Wyatt's fees and expenses,[2] resulting in a net claim of $137,368.73.

---

[2] The PPFC explained its calculation of the offset as follows:

> The probate court surcharged a total of $999,099.00 against Mr. Brault. Included in this amount was the $191,083.82 in attorneys' fees and costs that the probate court found Attorney Wyatt should repay, but also surcharged against Mr. Brault . . . . [T]he Fund determined that the percentage of the total surcharge due to Attorney Wyatt's attorneys' fees, 19.1%, should be the percentage by which Mr. Stacy's bond recovery would reduce his claim to the Fund. Accordingly, the Fund determined that Mr. Stacy's claim should be reduced by $36,481.00, which is the percentage of Mr. Stacy's $275,000.00 bond recovery attributable to Wyatt's conduct.

(Citations omitted).

The PPFC then addressed whether the petitioner's claim arose from Wyatt's theft or conversion of client funds.[3] It found that the petitioner failed to carry his burden on this issue. As to theft, the PPFC found that the evidence did not establish that Wyatt acted with the intent to steal when he received funds from the conservatorship estate in payment of his legal fees and expenses. With respect to conversion, the PPFC concluded that, because the funds were paid to Wyatt with the permission of the conservator, Wyatt did not act with the intent required for conversion since he did not know to a substantial certainty that his actions "would wrongfully deprive the one entitled to possession of the funds of possession." In addition, it found no conversion in Wyatt's failure to return the funds after we upheld the PCC's "determination that he had a conflict of interest because that determination came more than seven years after the last legal fees at issue were paid to [him] and six years after he filed for bankruptcy, after presumably spending the legal fees he received." This appeal followed.

II

■ The standard of review applicable to a decision of the PPFC is an issue of first impression. Supreme Court Rule 55(5) provides: "Decisions of the [PPFC] as to whether or not to pay claims and the amount of payments shall be within the [PPFC's] discretion . . . and will be reviewable *only* for unsustainable exercise of discretion." (Emphasis added.) In the context of awarding attorney's fees, we have described the unsustainable exercise of discretion standard as follows: "To be reversible on appeal, the discretion must have been exercised for reasons clearly untenable or to an extent clearly unreasonable to the prejudice of the objecting party. If there is some support in the record for the trial court's determination, we will uphold it." *LaMontagne Builders v. Brooks*, 154 N.H. 252, 259 (2006) (quotation omitted).

On appeal, the petitioner argues that the PPFC erred in finding that Wyatt had not committed theft or conversion when he collected and retained fees while knowing about the conflict of interest involved in his joint representation of the conservator and beneficiary of the conservatorship estate. We disagree.

■ The PPF "provid[es] some measure of reimbursement to victims who have lost money or property caused by the defalcation of lawyers." SUP. CT. R. 55(1). Reimbursement for defalcation requires "proven losses resulting from embezzlement, conversion, or theft of client funds by lawyers." SUP. CT. R. 55(2). The rule does not define the terms "embezzlement," "conver-

---

[3] The petitioner makes no claim that Wyatt's conduct constituted embezzlement within the meaning of Supreme Court Rule 55.

sion," or "theft." Supreme Court Rule 55 is consistent with the ABA Model Rules for Lawyer's Funds for Client Protection (ABA Model Rules), pursuant to which public protection funds generally "reimburs[e] losses caused by the dishonest conduct of lawyers." ABA Model Rule 1. " '[D]ishonest conduct' means wrongful acts committed by a lawyer *in the nature of* theft or embezzlement of money or the wrongful taking or conversion of money, property, or other things of value . . . ." ABA Model Rule 10 (emphasis added). Thus, the focus of our rule is upon dishonest takings by lawyers.

 Next, we consider the type of dishonesty contemplated by Supreme Court Rule 55. Given that the defalcating attorney must be suspended or disbarred before the client can obtain reimbursement, SUP. CT. R. 55(4), we consider the type of dishonest conduct that may warrant suspension or disbarment.

> An attorney may be disbarred or suspended under the disciplinary rule prohibiting an attorney from engaging in illegal conduct *involving dishonesty, fraud, deceit, or misrepresentation where the attorney converts or wrongfully retains, misappropriates, or misapplies* money or property received in his or her professional capacity. Continuing public confidence in the judicial system and the bar requires that the strictest attorney discipline be imposed in misappropriation cases and no circumstances ever justify the deliberate misappropriation of client's funds for a lawyer's personal benefit.

7 AM. JUR. 2D *Attorneys at Law* § 63, at 131-32 (2007) (emphasis added). The ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS, § 4.11, at 28 (1992) (STANDARDS)[4] pursuant to which we sanctioned Wyatt, *Wyatt's Case*, 159 N.H. at 307, recommend disbarment "when a lawyer knowingly converts client property and causes injury or potential injury to a client." The STANDARDS distinguish between knowingly dealing improperly with client property and knowingly *converting* client property.

> [S]uspension is generally fitting when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client. STANDARDS, *supra* § 4.12. Disbarment is reserved for when a lawyer "knowingly converts client property," in addition to causing injury or potential injury to the client. STANDARDS, *supra* § 4.11

---

[4] Although we have not adopted the STANDARDS, we look to them for guidance. *Coddington's Case*, 155 N.H. 66, 68 (2007).

*Coddington's Case,* 155 N.H. 66, 68 (2007); *see also In the Matter of Yalkut,* 176 P.3d 1119, 1126 (N.M. 2008) (finding no conversion or misappropriation of client funds where lawyer withdrew fees from trust account before he had earned them under mistaken belief that his "flat fee" agreement with client entitled him to do so). The STANDARDS also distinguish between conversion and failure to avoid a conflict of interest. *See* STANDARDS, *supra* § 4.31, at 31. We found that Wyatt had engaged in the latter, not the former.

■ Our case law is consistent with the policy of sanctioning most harshly "illegal conduct involving dishonesty, fraud, deceit, or misrepresentation where the attorney converts or wrongfully retains, misappropriates, or misapplies" client funds. 7 AM. JUR. 2D *Attorneys at Law* § 63, at 131; *see, e.g., Richmond's Case,* 153 N.H. 729, 745 (2006) (disbarring an attorney, as recommended by the STANDARDS, *supra* § 4.11, for knowingly converting client property and causing or potentially causing injury to the client when the attorney knowingly made transactions out of the client's brokerage accounts, against the client's express instructions, for the attorney's own benefit, and to the client's detriment); *Doherty's Case,* 142 N.H. 446, 451-52 (1997) (suspending an attorney for commingling and converting client funds by expending the funds before having earned them, disobeying four court orders to disgorge the funds, and placing his own financial difficulties above the needs of his clients, thus "seriously calling into question the absence of a selfish motive"); *cf. Coddington's Case,* 155 N.H. at 70-71 (suspending an attorney for commingling rather than knowingly converting client funds where, among other mitigating factors, "there was no evidence that the [attorney had a dishonest motive"]); *Douglas' Case,* 147 N.H. 538, 545 (2002) (suspending an attorney for improperly withdrawing client funds and applying them to her fees where the attorney "did not make any intentional misrepresentations and . . . her violations of the rules stemmed from her erroneous belief that she was authorized to withdraw the escrowed funds").

The petitioner relies upon *Douglas' Case,* 156 N.H. 613 (2007), arguing that it stands for the proposition that "applying client funds to the payment of legal bills without permission is an act of conversion." In *Douglas' Case,* we disbarred an attorney for violating several rules of professional conduct, including Rule 1.15(c), which requires an attorney to segregate client property during a dispute with a client over that property,[5] and Rule 8.4(c), which prohibits an attorney from engaging in conduct involving dishonesty,

---

[5] The requirement that an attorney segregate property that is subject to a dispute with the client now appears in Rule 1.15(g) rather than Rule 1.15(c), as it did when the events at issue in *Douglas' Case* transpired.

fraud, deceit or misrepresentation. *Douglas' Case*, 156 N.H. at 619-20. Petitioner cites the following passage from that case as supporting his position:

> The duty to safeguard property means that a lawyer may not use a client's or third party's funds for his own or his law firm's purposes. Such misuse is conversion. Conversion in the extreme sense occurs when a lawyer intentionally takes or uses client funds for his own or the law firm's use. Applying client funds to the client's bill without permission is an example of conversion.

*Id.* at 619 (quotations, citations, and brackets omitted). But the attorney conduct at issue in *Douglas' Case* is qualitatively different from Wyatt's conduct here.

First, the attorney in *Douglas' Case* failed to segregate client funds; despite a disagreement with the client as to whether the funds should be applied to the bill, the attorney withdrew them from her trust account, converted them into cash and then into Traveler's Checks, and put them into a safe. *Id.* at 617-18. Second, she misrepresented to the client the whereabouts of the funds. *Id.* at 620. Third, the attorney had a selfish motive. *Id.* at 623. We adopted the judicial referee's finding that the attorney engaged in knowing conversion and disbarred her, as recommended by the STANDARDS, *supra* § 4.11, at 28.

> The referee concluded that the [attorney] knowingly violated the duty to preserve her client's property, the duty to be candid and the duty to maintain personal integrity, and that her conduct caused injury or potential injury to [the client]. As the referee found, "the [attorney] knowingly converted [the client's] property when she withdrew the $49,000 from her trust account, without [the client's] knowledge or permission, and applied it to her fees." Accordingly, disbarment is the proper sanction.

*Id.* at 621.

Although we have sometimes suspended attorneys for conduct falling short of knowing dishonesty, based upon the above authorities, as well as the underlying purpose of the PPF, we conclude that, to obtain reimbursement from the PPF, a claimant must prove by a preponderance of the evidence that the losses resulted from an attorney's knowingly dishonest conduct. Public Protection Fund Reg. 500.13; *cf. O'Meyer v. Idaho State Bar*, 67 P.3d 82, 84 (Idaho 2003) ("[R]ecovery from [Client Security Fund] was not intended to be a substitute for a malpractice action. Reimbursement from the fund is limited to loss caused by a lawyer's dishonest

conduct." (quotation omitted)). The findings contained in *Wyatt's Case* and in the probate court's order fall short of such a showing.

■ Here, although Wyatt's submission of his legal bills evidences his intent to obtain payment from the petitioner and the conservatorship estate, Wyatt's conduct does not amount to a defalcation. The record supports the PPFC's finding that Wyatt sought and collected the fees and expenses under the honest, albeit erroneous, belief that he had a valid claim to them as compensation for the services he rendered. In fact, the petitioner did not contend before the PPFC, nor does he argue on appeal, that Wyatt's fees were unearned or unreasonable. Even granting that Wyatt acted with knowledge of his conflicted representation of both petitioner and Brault, as we found in *Wyatt's Case*, 159 N.H. at 307, knowledge of a conflict of interest is not the equivalent of knowingly dishonest conduct.

The probate court's order that Wyatt reimburse the conservatorship estate for the fees he collected does not persuade us to the contrary. First, Wyatt was not a party to the probate proceedings against Brault. Second, the court's conclusion that Wyatt was obligated to return his fees to the petitioner was predicated upon our holding in *In re Estate of McCool*, 131 N.H. at 351. In *McCool*, we held that "an attorney who violates our rules of professional conduct by engaging in clear conflicts of interest, of whose existence he either knew or should have known, may receive neither executor's nor legal fees for services he renders an estate." However, an attorney's obligation to return the fees based upon a conflict of interest did not compel the PPFC here to find that Wyatt's conduct involved dishonesty within the meaning of Rule 55.

For the foregoing reasons, we find that the PPFC sustainably exercised its discretion when it denied the petitioner's claim for failing to prove by a preponderance of the evidence that his losses resulted from the conversion or theft of client funds by Wyatt within the meaning of Rule 55. *See* SUP. CT. R. 55(5); Public Protection Fund Reg. 500.13. We therefore need not address the petitioner's other arguments on appeal.

*Affirmed.*

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred.